BLUE HILLS REGIONAL DISTRICT SCHOOL COMMITTEE
vs. MYRTLE R. FLIGHT & another.[1]

Norfolk. May 15, 1980. — August 29, 1980.

Present: BROWN, GREANEY, & PERRETTA, JJ.

*Arbitration*, School committee. *School and School Committee*, Arbitration, Collective bargaining. *Interest*.

A grievance arising from a school committee's alleged violation of an anti-discrimination clause in a collective bargaining agreement was arbitrable. [463-466]

An arbitrator acted beyond the scope of his authority in ordering a school committee to appoint a tenured teacher to an administrative position as a remedy for its violation of a collective bargaining agreement by failing to promote the teacher because of her sex [466-468]; however, this court was of the opinion that the policies that encourage arbitration of employment discrimination claims and that reserve the appointment of administrative personnel to the school committee could be best accommodated by remanding the matter to the arbitrator to fashion a new remedy [468-471].

It was within the authority of an arbitrator to award a teacher the salary differential between her position and an administrative position to which she was not appointed solely by reason of her sex, in violation of a collective bargaining agreement, for the period of time between the school committee's violation of the agreement and the date of the award; to commence the accumulation of interest as of the date of the violation; and to set the interest at nine per cent. [471-473]

CIVIL ACTION commenced in the Superior Court Department on July 2, 1978.

The case was heard by *Sullivan, J.*

*Thomas J. Butters* (*William J. Carr* with him) for the plaintiff.

*Alan J. McDonald* (*Gabriel O. Dumont, Jr.*, with him) for the defendants.

---

[1] Blue Hills Educational Association.

GREANEY, J.  This appeal raises questions concerning the scope of an award that an arbitrator may fashion when, in arbitration proceedings pursuant to G. L. c. 150E, § 8, he determines that a school committee has violated the terms of its collective bargaining contract with a public school education association by failing to promote a particular teacher to an administrative position because of her sex.

The relevant facts, taken from the record and the arbitrator's decision, are these.  The grievant is Myrtle R. Flight, a tenured teacher at the Blue Hills Regional Vocational-Technical School, who had served as department head of the health services and culinary arts divisions at the school.  In the spring of 1977, she and thirty-seven others applied for the posted position of assistant director, vocational subjects.[2]  The school's superintendent-director (superintendent), who had previously worked closely with Flight, interviewed several of the candidates, but did not interview Flight.  The superintendent ultimately recommended a male from outside the Blue Hills Regional staff for the job, whom the school committee subsequently appointed.

At the time of the appointment, the association and the committee were parties to a collective bargaining agreement which, by its terms, was effective for the period between September 1, 1976, and August 31, 1978.  Flight grieved her failure to receive the promotion on the basis that subsections 13.3 and 13.5 of Art. XIII of the agreement had been violated.  Subsection 13.3 provided that in dealing with promotions the school committee would give "due weight" to the professional background and attainments of

---

[2] The requirements for the position were:

"1. Candidate must have a Bachelor's Degree from an accredited college or university.
"2. Candidate must be an approved Vocational or Technical instructor.
"3. Candidate must have FIVE years of full-time experience as an instructor in Vocational Education.
"4. Candidate must pass a written and oral examination conducted by the Division of Occupational Education."

each applicant, including length of service in the school system, and that "[w]hen, in the opinion of the Committee, all other factors are substantially equal, preference will be given to qualified teachers already employed by the Committee . . . ." Subsection 13.5 of the agreement provided that "[a]ppointments will be made without regard to race, creed, color, religion, nationality, sex or marital status." Flight's grievance was not redressed at the first level of the grievance procedure provided by the agreement, and the superintendent denied relief at the second level, "apparently without explanation." At the third level, before the school committee, the superintendent presented a written comparison of the qualifications of Flight and the successful male applicant. This evaluation indicated that Flight held undergraduate degrees in medical-secretarial science and health services management, whereas the successful applicant possessed undergraduate degrees in engineering and industrial technology. It also showed that both candidates held master's degrees in administration of occupational education, that both had satisfied State certification requirements for the position, and that both possessed extensive teaching experience and backgrounds in the administration of vocational curricula. The superintendent's evaluation expressed his opinion that the male applicant's "background and experience are of far greater value to a bona fide vocational curriculum . . . than that of Mrs. Flight whose background consists mainly of the health-secretarial field." In denying the grievance, the committee stated that the appointee's "qualifications far outweighted those of any other candidates for [the] position."

Following the committee's action, Flight's grievance was submitted to arbitration in accordance with the agreement; the issues before the arbitrator were framed as they are set forth in the margin.[3] After concluding that the grievance

[3] "(1) Did the School Committee violate the collective bargaining agreement by failing to promote the grievant, Myrtle R. Flight, to the position of Assistant Director, Vocational Subjects? If so, what shall be the remedy?

"(2) Is the grievance arbitrable?"

was arbitrable, the arbitrator reviewed the qualifications of Flight and the appointee and received testimony from the superintendent. He determined that Flight's qualifications were, at the least, substantially equal to the appointee's, that they both satisfied the posted requirements for the position, and that the superintendent's not appointing Flight proceeded from unfounded sex-stereotyped assumptions, which the committee implicitly adopted by accepting the superintendent's recommendation. Those assumptions related to the perceived capability of the two candidates to deal with safety hazards in shop classes, with budget matters, and with trade and union representatives. The arbitrator also found that the superintendent had underrated Flight's experience in the vocational area by wrongly assuming that she had worked with programs which were in "typically female areas."

Upon an analysis of the whole case, the arbitrator concluded that Flight had been the victim of sex discrimination. As the primary award, he ordered that she be promoted to the position she sought, retroactively effective as of July 1, 1977, and that she be paid the salary differential between the jobs, with nine per cent interest from July 1, 1977, to the date of her appointment. As an alternative award, in the event that a court should determine that he lacked the power to order the promotion, the arbitrator ordered the school committee and the superintendent to conduct a de novo review of the grievant's and appointee's qualifications, and, if Flight's qualifications were found to be substantially equal to the appointee's, to promote her retroactively to the position and to pay the salary differential with interest.

Pursuant to opposing motions to vacate and to confirm the arbitral award,[4] a judge of the Superior Court entered a

---

[4] Under General Laws c. 150E, § 8, the final and binding arbitration of labor disputes involving public employees is enforceable under the provisions of G. L. c. 150C. Accordingly, the party prevailing in the arbitration may commence an action in the Superior Court to confirm the award under G. L. c. 150C, § 10, while at the same time, a losing party may seek in the same forum to vacate the award on any of the grounds set forth

final judgement,[5] ordering the committee to appoint Flight to the position retroactively effective as of July 1, 1977, and to pay her the salary differential from that date until the date of her appointment, with interest from September 18, 1978, at the rate of eight per cent. The committee has appealed from the modified judgment which confirmed the award, and the association and grievant have cross appealed from the portion of the judgment that altered the arbitrator's award of interest.

1. The school committee's brief does not directly challenge the arbitrability of the grievance.[6] Rather, the committee contends that enforcement of the award would intrude into an area that is reserved to its judgment. The

in G. L. c. 150C. § 11. The committee sought to "vacate, correct or modify" the award. It is apparent that the basic thrust of its application was to have the award vacated in its entirety on the ground described in G. L. c. 150C, § 11(a) (3), that the arbitrator "exceeded . . . [his] powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal laws."

[5] We have not discussed the parties' considerable procedural skirmishing over the contents of the judgment as originally entered on June 15, 1979. The postjudgment proceedings were terminated by the entry of a modified judgment on July 18, 1979. We treat the appeals as being taken from this judgment since all of the issues raised by the parties can be disposed of under its terms.

[6] The committee's brief asserts that the "conclusions reached by the arbitrator concerning discrimination against Ms. Flight on the basis of her sex do not conform to the standards required by Massachusetts law, " with citations to the decisions in *Wheelock College* v. *Massachusetts Commn. Against Discrimination,* 371 Mass. 130, 136-137 (1976), and *Smith College* v. *Massachusetts Commn. Against Discrimination,* 376 Mass. 221, 226-227 (1978). This contention is made as a passing reference in the context of conceding that the "appellant [committee] sees no useful purpose in any extended discussion as to whether the facts found by the arbitrator were justified by the evidence presented." It should be noted that the arbitrator reached his decision before the opinions were issued in the *Smith College* case and in *School Comm. of Braintree* v. *Massachusetts Commn. Against Discrimination,* 377 Mass. 424 (1979). It should also be observed that his decision generally conforms to the analysis recommended for sex discrimination cases by the *Braintree* case, 377 Mass. at 429-430, and that his findings warrant the conclusion that the grievant met her burden of proof in showing that the school committee had violated the non-discrimination clause of the contract, subsection 13.5.

grievant and the association assert that the nondelegability doctrine does not limit the arbitrator's authority to enforce in the public sector a specific contractual antidiscrimination provision by ordering the grievant's appointment.[7]

The nondelegation doctrine is rooted in the statutory authority conferred by the Legislature on local school committees to manage the public schools. G. L. c. 71, §§ 37 and 38. General Laws c. 71 § 16, extends the same prerogatives to the school committees for regional school districts. "By long established legislative policy school committees are given general management of the public schools including the election and dismissal of teachers . . . The success of a school system depends largely on the character and ability of the teachers. Unless a school committee has authority to employ and discharge teachers it would be difficult to perform properly its duty of managing a school system." *Davis* v. *School Comm. of Somerville,* 307 Mass. 354, 362 (1940). In the area of personnel, this authority has been interpreted to include the nondelegable and plenary power to make specific appointments of principals (*Berkshire Hills Regional Sch. Dist. Comm.* v. *Berkshire Hills Educ. Assn.,* 375 Mass. 522, 526-528 [1978]), to determine tenure for teachers (*School Comm. of Danvers* v. *Tyman,* 372 Mass. 106, 111-113 [1977]), to change the duties or rank of a teacher entrusted with special managerial authority (*Downey* v. *School Comm. of Lowell,* 305 Mass. 329, 331 [1940]), and to abolish supervisory positions no longer

_____

[7] Although the collective bargaining agreement from which this grievance arose expired in 1978, we do not consider the issues to be moot. The parties indicated that the subject is a continuing source of contention. The facts and circumstances of this case suggest that there is a substantial probability of mootness prior to the completion of any future litigation of the same issues, *First Natl. Bank* v. *Haufler,* 377 Mass. 209, 211 (1979), so that this case should be reviewed, being one "capable of repetition, yet evading review." *Karchmar* v. *Worcester,* 364 Mass. 124, 136 (1973), quoting from *Southern Pac. Terminal Co.* v. *ICC,* 219 U.S. 498, 515 (1911). See *School Comm. of West Bridgewater* v. *West Bridgewater Teachers' Assn.,* 372 Mass. 121, 125-126 (1977).

necessary to the efficient conduct of the schools (*School Comm. of Hanover* v. *Curry,* 369 Mass. 683, 684-685 [1976]; *School Comm. of Braintree* v. *Raymond,* 369 Mass. 686, 690 [1976]). In exercising their power of appointment, school committees have an affirmative duty "in the interest of the public to select the person . . . whom they [have] judged best fitted for [the position]." *Jantzen* v. *School Comm. of Chelmsford,* 332 Mass. 175, 177-178 (1955). These decisions and others (see cases collected in *School Comm. of West Springfield* v. *Korbut,* 373 Mass. 788, 795 [1977]), support the conclusion that the final appointment and reappointment of permanent academic personnel lie within the school committee's "zone of management prerogative over educational policy" which cannot be delegated to an arbitrator or be made the subject of an arbitration award which compels a school committee to surrender its discretion to a third party. *School Comm. of Boston* v. *Boston Teachers Local 66,* 378 Mass. 65, 72 (1979). See *School Comm. of Danvers* v. *Tyman,* 372 Mass. 106, 113 n.5 (1977).

Although a school committee cannot be compelled without its explicit consent to delegate its power to select for a management position the person it deems best qualified to serve the needs of the school system, "there is no reason why . . . [it] may not bind itself to follow certain procedures precedent to the making of any such decision." *Id.* at 113. Accord, *Dennis-Yarmouth Regional Sch. Comm.* v. *Dennis Teachers Assn.,* 372 Mass. 116, 120 (1977); *School Comm. of West Bridgewater* v. *West Bridgewater Teachers' Assn.,* 372 Mass. 121, 122 (1977); *School Comm. of New Bedford* v. *New Bedford Educators Assn.,* 9 Mass. App. Ct. 793, 797-800 (1980). Adherence to requirements which provide some assurance that the selection process will be fairly conducted mitigates the risk of harsh, abrupt, and uninformed decisions. The contract clauses involved in this case go beyond setting procedural requirements for the selection; both confer important substantive rights. Despite their substantive characteristics, there is no valid reason why a

school committee cannot obligate itself to arbitrate whether
a management appointment has been tainted by discrimi-
natory considerations. As the Supreme Court of the United
States has said in a related context with regard to the private
sector, "the grievance-arbitration machinery of [a] . . .
collective-bargaining agreement [provides] a relatively inex-
pensive and expeditious means for resolving a wide range of
disputes, including claims of discriminatory employment
practices." *Alexander* v. *Gardner-Denver Co.*, 415 U.S.
36, 55 (1974).[8] A provision in a collective bargaining agree-
ment which prohibits discrimination in any phase of the
employment relation safeguards a fundamental right shared
equally by employees working in a shop or in a schoolhouse
and one which cannot be withdrawn from an arbitral
forum on the theory that arbitration of the issues arising
under such a clause might deal with the ultimate question of
job entitlement. Thus the question of the arbitrability of
the grievances asserted in this case was properly submitted
to the arbitrator, and once he concluded that the issue was
arbitrable, "he [could] pass on the question whether the
school committee adhered to its obligations." *Dennis-
Yarmouth Regional Sch. Comm.* v. *Dennis Teachers Assn.*,
372 Mass. at 120.

However, that a grievance involving an antidiscrimina-
tion clause is arbitrable does not insulate the arbitrator's
award from judicial scrutiny. An established distinction ex-
ists between the power of a court to examine the merits of

---

[8] In the *Alexander* case the United States Supreme Court described some
of the advantages of the arbitral remedy for this type of grievance:
"Where the collective-bargaining agreement contains a non-discrimina-
tion clause . . ., and where arbitral procedures are fair and regular, ar-
bitration may well produce a settlement satisfactory to both employer and
employee. An employer thus has an incentive to make available the con-
ciliatory and therapeutic processes of arbitration which may satisfy an
employee's perceived need to resort to the judicial forum, thus saving the
employer the expense and aggravation associated with a lawsuit. For
similar reasons, the employee also has a strong incentive to arbitrate
grievances, and arbitration may often eliminate those misunderstandings
or discriminatory practices that might otherwise precipitate resort to the
judicial forum." 415 U.S. at 55.

the arbitrator's decision and its power to examine the propriety of enforcing the award. Judicial inquiry into the soundness of the arbitrator's resolution of the facts is rare and is typically exercised only to correct gross misconduct by the arbitrator (see, for example, the grounds for the vacation of an arbitrator's award enumerated in the first, second, and fourth subsections of G. L c. 150C, § 11 [*a*]). These restraints recognize that an arbitrator's competence pertains primarily to the law of the workplace with which courts lack familiarity, that the fact-finding process in arbitration is not equivalent to judicial fact-finding, and that the usual rules and procedures common to civil trials are ordinarily unavailable in arbitration. They also acknowledge the need for a speedy and technically unencumbered process to resolve labor-management disputes. See generally Gould, Labor Arbitration of Grievances Involving Racial Discrimination, 118 U.Pa.L.Rev. 40, 47-48 (1969).

Whether an arbitrator's remedy should be enforced is open to a broader inquiry. See Gorman, Labor Law c. 25 (1976). The authority for a court to refuse to enforce an award because its performance would contravene the law derives in part from statute, in particular G. L. c. 150C, § 11(*a*)(3), which requires vacation of an award if an arbitrator has "rendered [an order] . . . requiring a person to commit an act or engage in conduct prohibited by state or federal law," and in part from the doctrine that the resolution of statutory, constitutional, and policy issues is a primary responsibility of the courts which often requires for its proper discharge a judicial forum capable of balancing various competing interests. Cf. *Alexander* v. *Gardner-Denver Co.*, 415 U.S. at 57. As was stated in *UAW. Local 985* v. *W.M. Chace Co.*, 262 F. Supp. 114, 117 (E.D. Mich. 1966): "it does not follow that . . . [the arbitrator's] finding makes it unnecessary for the court to look beyond his opinion when confronted with a question of . . . [State] law . . . . In looking beyond the opinion, the Court is not attempting to second-guess the arbitrator. It is actually concerned with the *lawfulness of its enforcing* the award

and not with the *correctness of the arbitrator's* decision" (emphasis in original).

In the instant case, literal enforcement of the substantive relief given in either branch of the award would contravene the nondelegability doctrine by compelling or virtually compelling[9] the school committee to appoint the grievant to the position. As such the award is unlawful and cannot be enforced. At the same time, we must recognize that a blanket refusal to permit arbitrators to fashion meaningful remedies for the violation of nondiscrimination clauses in public employment contracts would seriously undercut the effectiveness of arbitration as a means to enforce an individual's rights to equal employment opportunities (cf. *Trustees of Tufts College* v. *Volpe Constr. Co.*, 358 Mass. 331, 340 [1970]), and would not serve this Commonwealth's firm condemnation of discrimination among employees "in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification." G. L. c. 151B, § 4, as amended by St. 1965, c. 397, § 4. See *Wheelock College* v. *Massachusetts Commn. Against Discrimination*, 371 Mass. 130, 137-139 (1976); *Smith College* v. *Massachusetts Commn. Against Discrimination*, 376 Mass. 221, 229-232 (1978). We think that the policies that encourage arbitration of employment discrimination claims and that reserve the appointment of administrative school personnel to the school committees can,

---

[9] We view the arbitrator's alternative award, which orders the school committee to conduct a de novo review of the qualifications of the grievant and the appointee, as falling in the category of awards that mandate appointment. This is so because out of thirty-eight original applicants, the grievant was ranked in the middle of the ten finalists for the position; others in this group were also already employed by the school committee; impermissible standards were used by the superintendent in evaluating the entire panel of applicants; and the arbitrator had before him the qualifications of only the grievant and the appointee. In these circumstances, an order requiring reconsideration of these two finalists would intrude on the superintendent's statutory duty to make a recommendation after he has fairly evaluated all the applicants, and on the committee's duty to determine what qualifications are substantially equal, assuming the superintendent has nominated an outside candidate.

on the facts in this record, be best accommodated by re-
manding the matter to the arbitrator to fashion a new
remedy. Upon remand, the arbitrator must avoid forcing
the parties to a predetermined destination — rather "as the
neutral, . . . [he should] decide the dispute [in a way]
which will once again place . . . the contracting parties on
that path which treats males and females equally." Rosen-
berg, Sex Discrimination and the Labor Arbitration Proc-
ess, 30 Lab. L.J. 102, 116 (1979).

In drafting the remedy, the arbitrator may, if he deems it
appropriate, declare the position to be vacant and require
the school committee and superintendent to begin the selec-
tion process anew.[10]  The award must respect the superin-
tendent's statutory right to nominate candidates for election
by the school committee (G. L. c. 71, § 38), and the com-
mittee's contractual and statutory rights to establish current
qualifications for the position, to weigh the applicants'
qualifications, to determine whether in-house candidates
have credentials substantially equal to those of individuals
from outside the system and to make the appointment based
on its assessment of the best interests of the school system.  It
is within the arbitrator's authority, however, to take such
steps as he deems necessary to assure that the process is fair
and nondiscriminatory.  In this regard, he may establish
procedures to increase the flow of accurate job-related in-
formation, to eliminate the use of biased material, and to
insure that the superintendent and the committee refrain
from labeling certain areas of the vocational curriculum as
"traditionally male" or as comprising "bona fide" voca-
tional subjects while downgrading others on the view that
they are "traditionally female."[11]  The arbitrator may

---

[10] This may be required because of the passage of time, the probability
that other candidates have secured other positions, and the fact that the
grievant was ranked in the middle of the ten finalists (albeit perhaps by
reason of the application of specious criteria).  Intervening events may
also pose other difficulties that have not been brought to our attention and
which may be best resolved in the first instance by the arbitrator.

[11] At the proper juncture, he may remind the committee that
Massachusetts adheres to statutory policy which encourages sex-neutral

also impose procedures to insulate the evaluation process from unsupported assumptions about the candidates' abilities that are based solely on sex stereotyping,[12] and such other safeguards as are deemed practicable to insure that the grievant's application will be "appraised in good faith and on equal terms with all others." *School Comm. of Southbridge* v. *Brown,* 375 Mass. 502, 506 (1978). Since almost three years "have passed since the time of the grie-

---

vocational subjects. See, e.g., G. L. c. 151C, § 2A(*a*), inserted by St. 1972, c. 101, § 3, making it an unfair educational practice for a vocational training institution to exclude students from the institution or any course of study because of their sex.

[12] A useful guide for the arbitrator, the superintendent, and the school committee can be found in the guidelines of the Federal Equal Employment Opportunity Commission that implement the protections of Title VII of the Civil Rights Act of 1964, 41 U.S.C. § 2000E-2(a) (1) (1976). These guidelines recite in part:

*"Sex as a bona fide occupational qualification.*

"(a) The commission believes that the bona fide occupational qualification exception as to sex should be interpreted narrowly. Label — "Men's jobs" and "Women's jobs" — tend to deny employment opportunities unnecessarily to one sex or the other.

"(1) The Commission will find that the following situations do not warrant the application of the bona fide occupational qualification exception:

"(i) The refusal to hire a woman because of her sex based on assumptions of the comparative employment characteristics of women in general. For example, the assumption that the turnover rate among women is higher than among men.

"(ii) The refusal to hire an individual based on stereotyped characterizations of the sexes. Such stereotypes include, for example, that men are less capable of assembling intricate equipment: that women are less capable of aggressive salesmanship. The principle of nondiscrimination requires that individuals be considered on the basis of individual capacities and not on the basis of any characteristics generally attributed to the group.

"(iii) The refusal to hire an individual because of the preferences of coworkers, the employer, clients or customers except as covered specifically in paragraph (a) (2) of this section.

"(2) Where it is necessary for the purpose of authenticity or genuineness, the Commission will consider sex to be a bona fide occupational qualification, e.g., an actor or actress." 29 C.F.R. 1604.2 (1979). See also "Discrimination defined: Relationship between use of selection procedures and discrimination," 29 C.F.R. 1607.3 (1979).

vance, the arbitrator may find it necesary to take additional evidence in order to take into account current conditions . . . [including] the present collective bargaining agreement." *School Comm. of New Bedford* v. *New Bedford Educators Assn.*, 9 Mass. App. Ct. 793, 803 (1980). Finally, we note our view of the decision that the arbitrator did not find that the conduct of the superintendent or the school committee amounted to "a pretense or device actuated by personal hostility." *School Comm. of Braintree* v. *Raymond*, 369 Mass. at 689. We, therefore, do not address the question whether in such a callous situation an arbitrator could order a specific appointment. See *Sweeney* v. *School Comm. of Revere*, 249 Mass. 525, 530 (1924).

2. The remaining issues concern the compensation component of the award. The arbitrator interpreted the agreement to require that the grievant be compensated for not having been paid as an assistant director from July 1, 1977, until the time the appointment is made. He therefore ordered the committee to pay the grievant the pay differential for that period. The payment of the salary differential from July 1, 1977, until the date of the award (June 20, 1978) was within his powers, and is separable from his unauthorized determination that the grievant be promoted. See *School Comm. of Braintree* v. *Raymond*, 369 Mass. at 691; *School Comm. of New Bedford* v. *New Bedford Educators Assn.*, *supra* at 803. The order that compensation be paid after that date constitutes an award of future compensation which is invalid for the reasons discussed at length in the *New Bedford* decision at page 803. However, from June 20, 1978, until the new award is fashioned, the arbitrator, depending on his resolution of the case upon remand, may award damages which compensate the grievant for the wrong suffered by her but which do not effectively compel the appointment. Within these bounds the arbitrator retains a reasonable measure of discretion to strike a balance between the rights of the parties. *Lawrence* v. *Falzarano*, 380 Mass. 18, 28 (1980).

We think it was also within the arbitrator's power to commence the accumulation of interest as of July 1, 1977,

and to set the interest at nine per cent. An arbitrator's award of interest, when made as a component of an award, is an integral part of the total remedy that he fashions and, as such, is not subject to the statutory provisions which apply to court-awarded interest on contract claims.[13] See G. L. c. 231, § 6C, as last amended by St. 1974, c. 224, § 2; *Turcotte* v. *DeWitt,* 333 Mass. 389, 392 (1955). See generally *Marlborough Firefighters, Local 1714* v. *Marlborough,* 375 Mass. 593, 600-601 (1978); *Watertown Firefighters, Local 1347* v. *Watertown,* 376 Mass. 706, 717-719 (1978). "Provisions of law applicable to judicial actions and proceedings do not necessarily apply to arbitrations. Parties who submit their controversies to arbitration forgo those provisions and leave all questions of law and fact to the arbitrators. The right to interest involves questions of fact and law that are within the purview of the arbitrators." Eager, The Arbitration Contract and Proceedings § 131 (1971). Interest included as part of the arbitrator's award must therefore be distinguished from interest added by a court pursuant to an award which is silent on the point. See *Marlborough Firefighters, supra* at 601 n.7. Even by analogy to G. L. c. 231, § 6C, interest on a contract claim runs from the date of the "breach," which the arbitrator in this case found to be the date on which Flight was denied the appointment, and as to this point we note, "[t]he terms of the award shall control as to payment of interest on the sum awarded." Eager, The Arbitration Contract and Proceedings, *supra* at § 143. Unless the interest component of the award exceeds the power of the arbitrator or requires performance of an act prohibited by law (G. L. c. 150C, § 11[*a*][3]), the fact that "the award . . . grants relief such that it could not grant or would not be granted by a court . . . shall not be ground for

---

[13] For this reason a judgment confirming or modifying an arbitrator's award is usually set forth in a form of judgment which makes no reference to the textual material concerning damages and interest contained in official Form 32 adopted as a model for judgments in a nonjury case by the reporters of the civil rules pursuant to Mass.R.Civ.P. 84, 365 Mass. 843 (1974).

vacating or refusing to confirm the award." *Id.* (*a*)(5). Interest at nine per cent on the salary differential between July 1, 1977, and June 20, 1978, is due to the grievant; interest on any damages awarded after remand should be established by the arbitrator.

3. Coming to disposition, we have found that the award of retroactive salary with nine per cent interest from the date the wrong occurred (July 1, 1977) until the date of the arbitrator's award (June 20, 1978) was proper. We have also concluded that the balance of the award should be vacated. The judgment entered in the case is not susceptible of modification in part and reversal in part. Accordingly, the judgment must be reversed and the entire case remanded to the Superior Court for remand by that court to the arbitrator so that he may fashion a new remedy consistent with this opinion. The Superior Court will retain jurisdiction of the case for such further proceedings under G L. c. 150C as may be necessary, and for the entry of a new final judgment consistent with this opinion.

*So ordered.*